# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

RUTH MARIE COOK,                     )
                                     )
            Plaintiff,               )
                                     )          Civil Action No. 3:02-0819
      v.                             )          Judge Nixon / Knowles
                                     )
JO ANNE BARNHART,                    )
Commissioner of Social Security      )
                                     )
            Defendant.               )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on cross-Motions for Judgment on the Administrative Record.

Docket Entry Nos. 13 and 19.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on

the Administrative Record be GRANTED.

## I.  INTRODUCTION

Plaintiff filed her first applications for DIB and SSI on January 9, 1997, alleging that she

had been disabled since January 1, 1995, due to diabetes; arthritis; depression; liver disease;

1

asthma; and sleep apnea. Docket Number 11, Attachment ("TR"), TR 116-118; 279-281; 100.

Plaintiff's applications were denied both initially (TR 99-100; 282-288) and upon

reconsideration (TR 101-102; 289-290). On September 26, 1997, Plaintiff requested a hearing.

TR 114-115. Plaintiff's request for a hearing was received on September 28, 1997, 102 days

after the date of the reconsideration determination. TR 114; 295. Because Plaintiff was required

to request a hearing within 60 days of receipt of the reconsideration determination,

Administrative Law Judge ("ALJ") Raymond W. Gliva dismissed Plaintiff's case on May 21,

1998. TR 295-296.

 On July 21, 1998, Plaintiff timely filed a request for review of the ALJ's dismissal. TR

302-305. On October 8, 1998, the Appeals Council issued a letter declining to review the case

(TR 306), thereby rendering the decision of the ALJ the final decision of the Commissioner.

There is no record that Plaintiff continued this initial proceeding.

 Plaintiff filed her second applications for DIB and SSI on November 25, 1998, alleging

that she had been disabled since November 30, 1996 (for DIB) and January 1, 1995 (for SSI) due

to diabetes; asthma; problems in her arms, legs, and back; sleep apnea; and vision problems. TR

592-595; 597; 632; 634.[1] Plaintiff's applications were denied initially (TR 596-597; 635-636),

and there is no record that she filed for reconsideration on these applications.

 Plaintiff filed a third, joint application[2] for DIB and SSI on February 28, 2000, alleging

that she had been disabled since November 30, 1996, due to multiple health problems, including

---

  [1]Page 633 is missing from the record.

  [2]Plaintiff's third application is solely a DIB application. TR 328-330. The
Commissioner has stated, however, that this application suffices as an application for both DIB
and SSI, and that she has treated, and would continue to treat, Plaintiff's application as such.
Docket Entry No. 20.

diabetes; fatigue; breathing problems; back pain; hypertension; liver problems; and depression.

TR 328-330; 300.

Plaintiff's joint application was denied both initially (TR 297-298)[3] and upon

reconsideration (TR 299-300). Plaintiff subsequently requested (TR 315-316) and received (TR

323-326) a hearing. Plaintiff's hearing was conducted on January 15, 2002, by Administrative

Law Judge ("ALJ") Mack H. Cherry. TR 35. Plaintiff and vocational expert ("VE"), Kenneth

Anchor, appeared and testified. *Id.* Plaintiff's daughter and two sons (Kim, Steven, and Michael

Cook) also appeared and testified. *Id.*

On March 18, 2002, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR

16-25. Specifically, the ALJ made the following findings of fact:

1. The claimant met the insured status requirements of the Act as of December 31, 1999.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date.

3. The claimant has "severe" impairments of sleep apnea, diabetes mellitus and degenerative disc disease.

4. The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant's allegations of pain and functional limitations are not credible.

6. The claimant retains the residual functional capacity to perform light work, that may require walking and/or standing 6 out of 8 hours in an 8-hour workday without

_____

[3]Page 298 is missing from the record.

interruption for 1 hour, and that does not require crawling or climbing ladders, that avoids extremes in temperature, dampness, wetness, humidity, fumes, odors, dust, gases, and hazardous machinery, and that does not involve understanding, remembering or carrying out detailed instructions, maintaining attention and concentration for extended periods of time, and dealing with the general public or adapting to changes in the work environment.

7.    The claimant has no identifiable transferable skills that she is able to perform.

8.    The claimant can perform her past relevant work as a telemarketer.

9.    The claimant was an individual of closely approaching advanced age on the DLI date.

10.   The claimant has a high-school education and 1 year of college.

11.   In the alternative, the framework of Rules 202.14 and 202.13 of the Medical-Vocational Guidelines and VE testimony demonstrate that the claimant has the residual functional capacity to perform jobs that exist in significant numbers in the national economy, including <u>Light Jobs</u>: General clerk, storage attendant; and, <u>Sedentary Jobs</u>: electric tester, cost clerk, and table worker.

12.   The claimant is not disabled within the meaning of the Act.

TR 24-25.

On May 20, 2002, Plaintiff timely filed a request for review of the hearing decision. TR 14-15. On June 27, 2002, the Appeals Council issued a letter declining to review the case (TR 11-12), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

4

## II. REVIEW OF THE RECORD

### A. Medical Evidence

**1. Physical Disability**

Plaintiff alleges disability due to multiple health problems, including diabetes; fatigue; breathing problems; back pain; hypertension; liver problems; and depression. TR 300.

A note from Dr. John Guillermin's office dated November 5, 1993 advised that when Plaintiff returned to work, she was not to drive, work around dangerous chemicals, use dangerous machinery, work near unprotected bodies of water, or work above ground levels. TR 711.

On March 17, 1994, Dr. Charles M. Gill completed a Medical Summary Statement, in which he reported that Plaintiff complained of stress urinary incontinence. TR 395. Dr. Gill noted that there was no sign of an infection or inflammation. *Id.* Dr. Gill recommended weight loss as a solution and also said he was "going to try her on an anticholinergic." *Id.*

Plaintiff saw Dr. Guillermin on July 30, 1994. TR 213-217. Dr. Guillermin conducted a comprehensive history and complete neurologic and musculoskeletal examination. TR 214. Plaintiff reported that she had been having sleep problems since the birth of her child. *Id.* She reported that she fell asleep while driving, while on the toilet, and at other "inappropriate" times, despite having adequate sleep. *Id.* Plaintiff stated that she got up about six to eight times per night, that she walked in her sleep, and that her condition was worsening. *Id.* According to Dr. Guillermin's report, Plaintiff was "[p]ositive for dizziness," but had "no true vertigo." *Id.* Dr. Guillermin's impressions were a sleep disorder, "dizziness, etiology unknown (hearing normal)," and headaches that were believed to be the result of tension. *Id.*

On August 10, 1994, Plaintiff underwent an electroencephalogram ("EEG"). TR 212.

5

The EEG report stated that Plaintiff's background was "well developed," "well modulated," and "symmetrical," with "no focal abnormalities" and "[n]o paroxysmal activity." *Id.* (emphasis omitted). The interpretation was "[n]ormal awake EEG." *Id.* Plaintiff was also admitted to University Medical Center in Lebanon, Tennessee, on August 10, 1994.[4] TR 416.

Plaintiff returned to Dr. Guillermin on August 20, 1994, at which time she stated that she continued to have problems with her sleep. TR 211. Plaintiff reported that she suffered from insomnia, continued to fall asleep at "inappropriate" times during the day, and sleep walked. *Id.* Dr. Guillermin noted that Plaintiff was "alert and oriented," with a stable gait and equal pupils. *Id.* Dr. Guillermin's impressions were the same as those on July 30. *Id.* Dr. Guillermin noted that he would attempt to schedule an MRI with sedation. *Id.*

Dr. Guillermin treated Plaintiff again on September 29, 1994. TR 210. According to Dr. Guillermin's notes, Plaintiff reported that she continued to have sleep problems and that she had been depressed recently. *Id.* Plaintiff underwent an "ENG," the result of which was "not definitive for labyrinthine or stem disease." *Id.* Dr. Guillermin noted that Plaintiff was "talking well," was "alert," "ambulate[d] independently well," and had "no paresis of her extremities." *Id.* He also noted that Plaintiff had no trouble talking, thinking, or remembering. *Id.* Dr. Guillermin's impressions were "sleep disorder, probably sleep apnea secondary to obstruction" and a seizure disorder. *Id.*

Dr. Scott Trochtenberg conducted a polysomnography study of Plaintiff on September 16, 1994. TR 687. Dr. Trochtenberg noted that during the study, Plaintiff spent 412 minutes in bed and slept for a total of 201 minutes. TR 688. Dr. Trochtenberg also noted that there was

_____

[4]Records from this hospital visit were requested, but none were submitted. TR 415-416.

6

some objective evidence of chronic sleep deprivation, and that Plaintiff did not achieve "REM" sleep. *Id.* Dr. Trochtenberg stated in his report that Plaintiff's sleep architecture was "grossly deranged and quite pathologic." *Id.* Dr. Trochtenberg further noted that Plaintiff had a total of nine apneas and 200 hypopneas while sleeping, and that Plaintiff had normal sinus rhythm. *Id.* Dr. Trochtenberg's impression was that Plaintiff had "severe obstructive sleep apnea with severe desaturation and hypoxemia, associated with very poor sleep efficiency and pathologic sleep architecture." *Id.* Dr. Trochtenberg recommended that Plaintiff undergo a repeat study with "titration of nasal CPAP," and further noted that Plaintiff would be a reasonable candidate for a tracheostomy "should she not tolerate nasal CPAP." *Id.*

Plaintiff was treated by Dr. Lightford from March 2, 1994 to November 7, 1994, for complaints of abdominal pain and sleep problems.[5] TR 218-231. Medical records submitted by Dr. Lightford include an x-ray report of Plaintiff's abdomen dated October 24, 1994. TR 226. Dr. Lightford's assessment was "Hepatomegaly with severe fatty infiltration of the liver." *Id.*

Dr. Patsy Manning treated Plaintiff on November 28, 1994, for complaints of abdominal pain and muscle spasm. TR 232. A CT scan was performed, which demonstrated "hepatomegaly with fatty infiltration" of the liver, which is "consistent with poorly controlled diabetes." *Id.* Dr. Manning noted that Plaintiff had been diagnosed with diabetes about six months prior to her examination, and that Plaintiff had reported difficulty controlling her blood sugar. *Id.* According to Dr. Manning, Plaintiff's laboratory test results were "unremarkable except for an elevation of the GGT to 122, Triglycerides to 377 and glucose to 258." *Id.* Dr. Manning talked with Plaintiff about her need to follow a low-fat diet in order to control her

---

[5]These records are mostly illegible.

7

blood sugar and reduce her weight. *Id.*

Plaintiff went to the emergency room at Sumner Regional Medical Center on September 14, 1995. TR 400. Plaintiff complained of having had a cold for the past five to six days, and reported that she had experienced some bleeding from the left naris the previous day. *Id.* Dr. Douglas Alvey examined Plaintiff and noted that her lungs were "[c]lear to auscultation"; her heart rate and rhythm were regular; and that Plaintiff appeared to be "alert and oriented." *Id.* Dr. Alvey also reported that Plaintiff's throat was "slightly red" and her nose had "slight congestion." *Id.* Dr. Alvey diagnosed Plaintiff with "[p]haryngitis," "[b]ronchitis," and "[h]istory of NIDDM." *Id.* Dr. Alvey prescribed Amoxicillin. *Id.*

Plaintiff returned to the emergency room at Sumner Regional Medical Center on December 29, 1995. TR 399. Plaintiff complained of a cough, a fever, and "malaise." *Id.* Dr. Charles Ruark examined Plaintiff, and diagnosed her with an "[u]pper respiratory tract infection," "[e]arly diabetes," and "[b]ronchitis." *Id.* Dr. Ruark additionally noted that Plaintiff reported that said she had been "out of diabetic medicines for a month." *Id.*

Records from Sumner Regional Medical Center dated December 30, 1995, were also submitted. TR 403. A chest examination of Plaintiff revealed "[p]ossible bronchitis," with "[n]o segmental changes to indicate pneumonia." *Id.*

Dr. Herbon Fleming examined Plaintiff on March 20, 1996.[6] TR 247. In Plaintiff's medical history, he noted that Plaintiff had "noninsulin dependent diabetes for five years on oral agent," as well as a "strong family history of diabetes." *Id.* Dr. Fleming also noted Plaintiff's "history of sleep apnea, arthritic symptoms of the wrist, hands, and knees, asthma, enlarged liver,

---

[6]Dr. Fleming's records include test results from March 6, 1996, but the results could not be deciphered. TR 249-254.

as well as irregular heart beats several times a month," and he further noted that Plaintiff smoked one and a half to two packs of cigarettes per day.  *Id.*  Plaintiff reported incontinence when she coughed, but denied black stools and abdominal or chest pain.  *Id.*  Dr. Fleming's impression was that Plaintiff had "noninsulin dependent diabetes and a history consistent with sleep apnea, asthma, as well as an enlarged liver."  TR 248.  In a note dated January 22, 1997, Dr. Fleming opined that Plaintiff was unable to work at that time.  TR 242.

On April 23, 1996, Plaintiff went to the emergency room at Sumner Regional Medical Center and reported that her blood sugar level had been recorded at over 500.  TR 233.  Plaintiff described "increased problems with her peripheral neuropathy over the past 2 days," as well as increased "problems with her balance."  *Id.*  Dr. David Jones noted that Plaintiff was given three units of "Humulin R" and observed for approximately 90 minutes.  *Id.*  When Plaintiff remained stable, she was discharged in "satisfactory condition."  *Id.*  Dr. Jones' impressions were "[d]iabetes mellitus with hyperglycemia" and "[d]iabetes with poor compliance and control."  *Id.*  Dr. Jones also noted that Plaintiff demonstrated "[g]rade I-II diabetic retinopathy changes."  *Id.*

"Home CPAP" evaluations of Plaintiff were conducted on April 26, 1996 and April 30, 1996.[7]  TR 245-246.  The April 26 report noted that Plaintiff experienced a "panic" feeling when she had the "CPAP" mask on, and that Plaintiff felt that the machine "takes her breath away." TR 246.  Another report from that same date indicated that Plaintiff was "homebound due to decreased endurance, lethargy, and unstable metabolic status."  TR 237 (capitalization omitted). This report also stated that Plaintiff reported falling asleep while sitting up.  *Id.*  On April 26, 1996, Sharon Schutt, R.N., ordered insulin injections for Plaintiff, and noted "2+" edema in

_____

[7]The therapist's signature is illegible.  TR 245-246.

Plaintiff's feet.  *Id.*

The April 30 report noted that Plaintiff was "comfortable" when the machine was on the "Ramp feature," but that as the ramp time expired, the pressure became "to [*sic*] great" for her to sleep.  TR 245.  The therapist noted that Plaintiff expressed willingness to work with the equipment, but that she was having difficulty.  *Id.*  The therapist also noted that he/she suggested an "adjustable C-PAP" to Plaintiff, that Plaintiff agreed to one, and that the therapist would ask Dr. Fleming if this treatment was acceptable.  *Id.*

Dr. Alvey performed a chest examination of Plaintiff at Sumner Regional Medical Center on November 28, 1996.  TR 402.  In his report, Dr. Alvey noted that Plaintiff's heart size and vascular pattern were "normal," but that she demonstrated "[d]iffuse bronchial interstitial prominence."  *Id.*

On February 10, 1997, Plaintiff was treated by Dr. Michael E. Green.  TR 496.  Plaintiff reported "decreased visual acuity especially with bright light and headlights."  *Id.*  Dr. Green also performed a routine diabetic retinopathy check.  *Id.*  Dr. Green noted that Plaintiff had a "posterior subcapsular cataract of her left eye," and scheduled a cataract operation for Plaintiff to be performed on February 26, 1997.  *Id.*  The operation was performed successfully on that date.  TR 440.  In a letter dated December 10, 1998, Dr. Green reported that after Plaintiff's cataract surgery, her corrected visual acuity on both eyes was "better than 20/20."  TR 490.  Dr. Green also noted that Plaintiff showed no evidence of background diabetic retinopathy and that, in his opinion, she did not qualify for disability based upon her eyes.  *Id.*

On March 4, 1997, Dr. Hamsaveni Kambam completed a Physical Residual Functional Capacity Assessment of Plaintiff.  TR 255-262.  Dr. Kambam opined that Plaintiff could occasionally lift and/or carry a maximum of 50 pounds, frequently lift and/or carry a maximum

10

of 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and was not limited in her ability to push and pull. TR 256. Dr. Kambam opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. TR 257. No manipulative, visual, or communicative limitations were noted. TR 258-259. Dr. Kambam recommended that Plaintiff avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and he further recommended that Plaintiff avoid all exposure to hazards such as machinery and heights. TR 259.

Dr. Melinda Reed also submitted medical records dated March 3, 1996 through April 9, 1997.[8] TR 263-269.

On May 12, 1997, Dr. Orrin L. Jones completed a Physical Residual Functional Capacity Assessment of Plaintiff. TR 270-277. Dr. Jones opined that Plaintiff could occasionally lift and/or carry a maximum of 50 pounds, frequently lift and/or carry a maximum of 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and that she had unlimited pushing and pulling abilities. TR 271. Dr. Jones opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. TR 272. No manipulative, visual, or communicative limitations were noted. TR 273-274. Dr. Jones recommended that Plaintiff avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and further recommended that Plaintiff should avoid all exposure to hazards such as machinery and heights. TR 274.

Plaintiff saw Dr. Ted Hill on August 11, 1997. TR 472. Plaintiff complained of having trouble balancing, and noted that she had been suffering from diabetes for "at least 5 years." *Id.*

_____

[8]Most of these records are illegible, and the notes that are legible cannot be placed in context.

Plaintiff also noted that she had been diagnosed with sleep apnea, and that she "wears oxygen" at night. *Id.* Plaintiff stated that her blood sugar level averaged around 200 and occasionally rose into the 300 range. *Id.* Plaintiff told Dr. Hill that she was on a "no sugar diet," but admitted that she did not watch her diet and did not make any efforts to exercise. *Id.*

On October 31, 1997, Dr. Hill wrote a letter to Plaintiff reporting that recent laboratory test results were "within normal limits." TR 726.

On March 19, 1998, Plaintiff reportedly stated to Dr. Hill that she "feels like her bottom is falling out, her low abdomen in particular." TR 469. Plaintiff also complained of coughing, and noted that she thought her sleep apnea had gotten "worse." *Id.* Dr. Hill gave Plaintiff a 10-day dose of Ceclor and also prescribed Codiclear for her cough. *Id.*

On April 6, 1998, Plaintiff reportedly told Dr. Hill that her cough was "significantly better," but that her sputum continued to be somewhat "dark," and that she was still coughing. TR 468. On May 18, 1998, Dr. Hill noted that Plaintiff had been delinquent in checking her blood sugar level. TR 467. Dr. Hill discussed with Plaintiff the importance of keeping a log of her blood sugar. *Id.*

On May 1, 1998, Dr. Hill completed a Medical Assessment of Plaintiff's Ability to Do Work-Related Activities. TR 718-719. Dr. Hill opined that Plaintiff could occasionally lift and/or carry 10 pounds and could not frequently lift any weight. TR 718. Dr. Hill also opined that Plaintiff could stand and/or walk for two to four hours total in an eight-hour workday, and zero hours without interruption. *Id.* Dr. Hill further opined that Plaintiff could sit for two to four hours total in an eight-hour workday, and two hours without interruption. *Id.* Dr. Hill stated that Plaintiff could never balance, climb, stoop, crouch, crawl, or kneel. TR 719. He further opined that Plaintiff's ability to reach, handle objects, feel objects, push, and pull were affected by her

12

impairments. *Id.* Dr. Hill noted that Plaintiff's environmental limitations were moving machinery, chemicals, and noise. *Id.*

On August 19, 1998, Plaintiff saw one of Dr. Hill's associates, as Dr. Hill was absent from the office that day.[9] TR 466. Plaintiff reported that she had been experiencing increased respiratory problems since "her kitchen blew up" a few days earlier. *Id.* A chest x-ray was performed, and the doctor noted that Plaintiff demonstrated "no bronchial thickening" and that her x-ray was "unchanged" from one taken several months earlier. *Id.* The doctor prescribed a Nasacort inhaler. *Id.*

On October 8, 1998, Dr. Hill noted that Plaintiff continued to neglect her diabetes treatment. TR 465. Plaintiff reported that her glucometer broke after a fire at her house, and Dr. Hill refilled it during this examination. *Id.*

Plaintiff returned to Dr. Hill on December 7, 1998. TR 464. Dr. Hill noted that Plaintiff was "sleeping soundly" when he walked into the room. *Id.* Plaintiff reported swelling in her legs and feet. *Id.* Dr. Hill gave Plaintiff Lasix to help with her edema, as well as some cough syrup. *Id.* Leg edema was also noted on February 19, 1999. TR 463.

On February 15, 1999, Dr. Bruce A. Davis completed a consultative examination of Plaintiff. TR 628–630. Dr. Davis noted that Plaintiff had diabetes and a five-year history of elevated blood sugar that was treated with diet, insulin, and home blood sugar self-monitoring. TR 628. Dr. Davis further noted that Plaintiff reported "dizziness without blackout," and that she took Altace for her diabetes. TR 628. Dr. Davis also noted that Plaintiff reported a history of breathing complaints including: shortness of breath with activity, wheezing, and coughing.

---

[9]The name of this doctor is illegible. TR 466.

13

*Id.* Plaintiff's treatments were noted to be an inhaler, home nebulizer, and oxygen. *Id.* Dr. Davis also noted Plaintiff's documented sleep apnea, and that she was unable to tolerate "C-PAP" treatment. *Id.* Dr. Davis' diagnoses were "Class III Extreme Obesity"; "Insulin-dependent diabetes mellitus: dizziness, proteinuria"; "adult bronchial asthma treatment, cigarette smoker, sleep apnea"; "musculoskeletal disease: osteoarthritis, osteoporosis complaints"; "anxiety/depression treatment"; "Gastrointestinal disease: cholecystectomy, ventral hernia repair, enlarged tender liver"; and "left cataract surgery." TR 630.

Dr. Davis opined that Plaintiff was capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently, that she could stand or walk for six hours in an eight-hour workday, that she could sit for eight hours in an eight-hour workday, and that she was limited in her ability to bend. TR 630. Dr. Davis also opined that Plaintiff was limited in her exposure to irritating inhalants, heights, and climbing. *Id.*

On February 19, 1999, Dr. George W. Sounds completed a Physical Residual Functional Capacity Assessment based on Plaintiff's medical records. TR 598-605. Dr. Sounds opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and could push and/or pull without limitation. TR 599. Dr. Sounds also opined that Plaintiff could occasionally climb, balance, and stoop, and that Plaintiff could frequently kneel, crouch, and crawl. TR 600. No manipulative, visual, or communicative limitations were noted. TR 602. Dr. Sounds reported that Plaintiff had no environmental limitations except that she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. *Id.*

Dr. Hill noted that Plaintiff had "significant" edema on April 12, 1999. TR 462. At this

14

time, Dr. Hill reportedly told Plaintiff he "was really frightened with her taking this much insulin."[10]  *Id.*

Plaintiff returned to Dr. Hill on October 19, 1999, complaining of pain in her right leg, knee, and back.  TR 460.  Plaintiff reported pain radiating around her abdomen into her leg.  *Id.*  Dr. Hill opined that Plaintiff "probably has spinal stenosis."  *Id.*  Dr. Hill also noted that Plaintiff had lost weight.  *Id.*

On April 18, 2000, Dr. Hill noted that Plaintiff reported trouble with her eyes and a "blurry spot" in her right eye.  TR 458.  He noted that Plaintiff's weight was stable, but that she was overweight.  *Id.*  Dr. Hill noted improvement in Plaintiff's blood sugar levels.  *Id.*  Once again, Dr. Hill noted Plaintiff's non-compliance with her diabetes treatment.  *Id.*  Plaintiff also reported incontinence to Dr. Hill, and he prescribed Lasix.  *Id.*

Dr. Albert J. Gomez performed a consultative examination of Plaintiff on April 26, 2000.  TR 422.  Plaintiff presented with a complaint of low back pain that she described as "aching-type, severe, intermittent, and without radiation."  *Id.*  Plaintiff also gave a history of sleep apnea.  *Id.*  A physical examination revealed that Plaintiff had a full range of motion in her shoulders, elbows, and wrists.  TR 423.  Plaintiff's hips also had a full range of motion except for flexion, which was decreased bilaterally to 90 degrees.  *Id.*  Dr. Gomez cited Plaintiff's obesity as a cause of this decreased range of motion.  *Id.*  There was no tenderness to palpitation to either of Plaintiff's hip joints.  *Id.*  Both Plaintiff's knees had "decreased flexion to 120 [degrees] due to her obesity."  *Id.*  Dr. Gomez reported that Plaintiff had "normal extension" in both knees.  TR 424.  Dr. Gomez also noted that Plaintiff's back "had moderate tenderness to

_____

[10]Much of this record cannot be read because a photocopy of another document overlaps it.  TR 462.

15

palpitation of the lumbrosacral spine with the following decreases in ranges: Flexion normal, extension 20 [degrees], right and left lateral flexion 20 [degrees]." *Id.*

Dr. Gomez opined that Plaintiff could occasionally lift 20 pounds in an eight-hour workday, and that she could stand or sit at least six hours in an eight-hour workday with normal breaks. TR 424. Dr. Gomez's impressions were "[i]nsulin-dependent diabetes mellitus, by history," "[o]besity," "[l]ow-back pain," "[h]istory of sleep apnea," "[h]istory of COPD," and "[h]istory of diabetic neuropathy." *Id.*

On May 3, 2000, Dr. Green performed an operation on Plaintiff's right eye to remove a posterior subcapsular cataract. TR 435. Dr. Green noted in a letter dated August 24, 2000 that Plaintiff's corrected visual acuity was "at least 20/20" in both eyes. TR 485. Dr. Green also noted that Plaintiff's diabetes "has not demonstrated any retinopathy in either eye." *Id.* Dr. Green summarized that Plaintiff had done "extremely well" with her cataract surgery. *Id.* He added that "from my standpoint [Plaintiff] certainly does not qualify for any disability benefits." *Id.* (emphasis in original).

On July 27, 2000, a physician completed a Medical Assessment of Plaintiff's Ability to Do Work-Related Activities.[11] TR 473-475. This physician opined that Plaintiff could occasionally lift and/or carry 10 pounds, stand and/or walk for less than two hours in an eight-hour workday, and sit less than about six hours in an eight-hour workday.[12] TR 473-474. The assessment reported that Plaintiff was limited in pushing and pulling in both her upper and lower extremities. TR 474. The assessment also stated that Plaintiff could occasionally kneel, and that

_____

[11]The signature on this record is illegible. TR 475.

[12]The individual who filled out this form did not provide an answer to the question of how much weight Plaintiff could frequently lift. TR 473.

16

she could never climb, balance, crouch, or crawl.  *Id.*  Plaintiff was noted to have manipulative limitations in reaching, handling, fingering, or feeling; visual/communicative limitations in seeing; and environmental limitations with regard to dust, vibration, humidity, hazards, fumes, odors, chemicals, and gases.  TR 475.

On August 23, 2000, Dr. Lawrence G. Schull completed a Physical Residual Functional Capacity Assessment based on Plaintiff's medical records.  TR 476-484.  Dr. Schull opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and could push and/or pull without limitation.  TR 477-478.  Dr. Schull also opined that Plaintiff could occasionally climb and kneel, and that she could frequently balance, stoop, crouch, and crawl.  TR 479.  No manipulative, visual, communicative, or environmental limitations were noted.  TR 480-481.  Dr. Schull opined that Dr. Gomez's and Dr. Hill's medical assessments were "too restrictive."  TR 483.

Plaintiff returned to Dr. Hill on August 28, 2000.  TR 531.  Plaintiff reported that she was monitoring her blood sugars.  *Id.*  Dr. Hill noted that Plaintiff's blood sugar levels were "really reasonable."  *Id.*  At this time, Plaintiff also reported pain in her neck, especially when she changed positions.  *Id.*

Plaintiff's next appointment with Dr. Hill was on October 23, 2000.  TR 529.  Plaintiff complained of an irregular heartbeat and stated that she had previously been hospitalized in the intensive care unit for this problem.  *Id.*  Plaintiff reported that when her heartbeat "skips," she felt pain in her head, arms, and jaw.  *Id.*  Plaintiff also complained of pain at the base of her neck and in her low back.  *Id.*  Dr. Hill noted that Plaintiff had a "hump in her upper thoracic area posteriorly," but that there was "no real pain or tenderness there."  *Id.*  Plaintiff's cardiac exam

17

was "regular without ectopy." *Id.*

On December 14, 2000, Dr. Sam Pearson ordered a chest x-ray of Plaintiff. TR 537. Dr. Pearson noted that Plaintiff's "[c]ardiac silhouette is magnified," her "interstitial markings in the lungs are thickened," the "costophrenic angles are underpenetrated," and "[n]o alveolar consolidation is appreciated." *Id.* Dr. Pearson's impression was that Plaintiff's chest was "[s]table," and he did not list any acute findings. *Id.*

Plaintiff was examined by Dr. Hill on January 11, 2001. TR 528. Plaintiff reportedly told Dr. Hill that her blood sugar was "under control." *Id.* She did, however, report a "heavy sense in her chest and shortness of breath and feeling like she is going to die, a sense of doom, anxiety and nervousness," swelling in her face and neck a few days before the appointment, and back pain radiating down both legs. *Id.* Dr. Hill gave Plaintiff some "Pen-Vee-K" and ordered x-rays of Plaintiff's back. *Id.* Dr. Hill also noted edema in Plaintiff's ankles and reported that a straight leg raise was positive bilaterally. Id. Dr. John Bartek examined Plaintiff's back on January 11, 2001, and noted degenerative changes to Plaintiff's lower lumbar spine, especially in the "L4-L5" area. TR 517.

Dr. Arthur Cushman examined Plaintiff on February 9, 2001, and diagnosed her with "probable lumbar spinal stenosis with neurogenic claudication." TR 568. On February 14, 2001, Dr. Cushman conducted another examination of Plaintiff's back. TR 516. Dr. Cushman's impressions were "marked degenerative disc changes and disc space narrowing with broad-based disc protrusion, L5-S1, which has right lateral protrusion with involvement of the right L5-S1 neural foramen predominantly," "canal stenosis present, L4-5, associated with moderate to large central disc protrusion and posterior element hypertrophy," and "suggestion of hepatomegaly." *Id.*

18

Plaintiff saw one of Dr. Hill's associates, Dr. Wright,[13] in Dr. Hill's absence, on February 19, 2001. TR 527. Plaintiff complained of back pain, leg pain, a sore throat, and a cough. *Id.* Plaintiff reported that her blood sugar was in "the 270 range" the previous day. *Id.* Dr. Wright noted that Plaintiff was "rather significantly obese," but that her lungs were clear and he did not hear wheezes. *Id.* Dr. Wright's impressions were "[n]asal pharyngitis," "[b]ronchitis," "[i]nsulin dependent diabetes mellitus," and "[h]ypertension." *Id.* Dr. Wright gave Plaintiff samples of Ceftin and began her on "Liquibid D b.i.d." *Id.*

Dr. Jeffrey Landman prepared a CT scan report on February 27, 2001. TR 515. Dr. Landman's impressions were "[m]arked central spinal stenosis of the 4-5 level secondary to central herniation of the disc and facet hypertrophy" and "[s]oft tissue density in the anterior canal on the right with mild effacement of the epidural fat around the S1 root on the right most." *Id.* An electromyography report from that same day noted that "this electrophysiological study is suggestive of an abnormality in the S1 nerve root distribution. Changes were acute in nature." TR 512.

Plaintiff returned to Dr. Hill on March 6, 2001, reporting chills, myalgias, a cough with sputum, and congestion. TR 526. Plaintiff mentioned that her blood sugar levels had remained stable. *Id.* Plaintiff also reported that she had an "MR"[14] that suggested a disc protrusion in her back. *Id.* Dr. Hill's impressions were a "respiratory tract infection," "[s]inusitis," and "bronchitis." *Id.* Dr. Hill gave Plaintiff samples of Avelox. *Id.*

Plaintiff returned to Dr. Cushman on March 14, 2001. TR 566. At that time, it was noted

---

[13]Dr. Wright's first name is not noted in the record.

[14]This appears to be a typographical error.

19

that her "EMG" and myelogram (both performed on February 27, 2001) were positive. *Id.* Dr. Cushman advised a decompressive laminectomy and a "possible diskectomy." *Id.*

Plaintiff returned to Dr. Hill on May 21, 2001. TR 524. Plaintiff complained of pain in her left "SI" joint area and buttock area with radiation down one of her legs. *Id.* Plaintiff reported that the pain made her nauseated. *Id.* Plaintiff's blood sugar levels were "reasonable." *Id.* Dr. Hill's assessment was that Plaintiff's diabetes was "fairly well controlled." *Id.* Dr. Hill discussed surgical options with Plaintiff, and gave Plaintiff Darvocet for her back pain. *Id.*

Dr. Cushman performed a decompressive lumbar laminectomy and diskectomy on Plaintiff on June 12, 2001. TR 562. As Dr. Cushman noted, Plaintiff underwent "elective microscopic decompressive lumbar laminectomy, bilaterally, at the L4-5 level. She also underwent excision of disc, L5-S1 on the right." TR 570. Dr. Cushman noted that Plaintiff "tolerated the operative procedure well," and that she stated a "significant decrease" in her radicular pain after the surgery. *Id.*

On June 22, 2001, Dr. Cushman noted that that Plaintiff was "doing well" from her surgery and that she "ambulates without difficulty." TR 562. Plaintiff returned to Dr. Cushman on July 23, 2001, and complained of pain in her right leg when walking long distances. *Id.* Dr. Cushman noted that Plaintiff had no numbness or weakness and that her wound was "healing well." *Id.* Plaintiff was instructed in a home exercise program. TR 560.

Plaintiff returned to Dr. Hill on July 9, 2001. TR 520. Plaintiff reported that her pain had improved since her operation, but that she still had pain in her right leg, and pain in both knees that predated her other neuropathic symptoms. *Id.* Plaintiff reported that standing for any length of time made her legs "kind of knot up." *Id.* Plaintiff also stated that her blood sugar was "doing okay." *Id.* Dr. Hill's assessments were hypertension and leg pain. *Id.*

20

Dr. Hill examined Plaintiff on October 18, 2001. TR 519. Dr. Hill noted that Plaintiff reported pain in her right hip and cramps in her calves and feet. *Id.* Dr. Hill also noted that Plaintiff had lost her blood sugar meter and that she stated she had "not been taking her blood sugar recently." *Id.* Plaintiff also reported a cough with sputum. *Id.* Dr. Hill added that Plaintiff had gained a significant amount of weight, and that she had ankle edema. *Id.* His impression was: "recent exacerbation of COPD with acute bronchitis superimposed from chronic bronchitis. Peripheral vascular disease." *Id.*

On October 25, 2001, Plaintiff underwent an arterial doppler examination that was ordered by Dr. Hill and performed by Dr. E. Len Goodin. TR 580. The examination report noted that Plaintiff's right ankle-brachial index was 0.99 and her left ankle-brachial index was 1.04. *Id.* The results of this examination revealed "claudication," with "[m]ild peripheral vascular disease" in the right leg. *Id.* (capitalization omitted).

Dr. Mona K. Mishu completed a Physical Residual Functional Capacity Assessment of Plaintiff.[15] TR 425-432. Dr. Mishu opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull without limitation. TR 426. Dr. Mishu also opined that Plaintiff could occasionally climb and kneel, and that she could frequently balance, stoop, crouch, and crawl. TR 427. No manipulative, visual, communicative, or environmental limitations were noted. TR 428-429.

## 2. Mental Disability

Plaintiff also alleges disability due to depression and an I.Q. of 70. Docket Entry No. 14.

---

[15]This record is undated.

On August 8, 1996, Dr. Lightford noted that Plaintiff was depressed. TR 222. Dr. Melinda Reed noted Plaintiff's depression on December 16, 1996, and prescribed Prozac. TR 264. On August 21, 1997, Plaintiff complained of depression to Dr. Hill and noted that she had been taking Prozac. TR 471. Dr. Hill noted that Plaintiff started crying during the examination, and that she reported depression and lack of energy. *Id.* Plaintiff told Dr. Hill that her depression interfered with her other medical treatments. TR 470.

On March 17, 1999, Dr. Jeri L. Lee, a licenced psychologist, examined Plaintiff. TR 417. Dr. Lee conducted a clinical interview of Plaintiff, and she administered a mental status examination, the Wide Range Achievement Test Third Edition (WRAT3), and the Wechsler Adult Intelligence Scale Third Edition (WAIS-III). *Id.* Dr. Lee noted that Plaintiff "is not considered a totally accurate historian as she cannot recall events or offer a consistent self-report and intellectual functioning seems to be low." *Id.* Plaintiff's I.Q. scores were a verbal score of 91, a performance score of 70, and a full scale score of 79. TR 419. Dr. Lee also administered a reading test, which revealed that Plaintiff read at a fifth grade level. TR 420. Dr. Lee's diagnoses included "rule out major depressive disorder, recurrent, moderate," "rule out somatization disorder," "rule out panic disorder without agoraphobia," and borderline intellectual functioning. *Id.*

A Psychiatric Review Technique form regarding Plaintiff was completed on March 25, 1999.[16] TR 606-614. The form indicated "RFC Assessment Necessary," and based this disposition upon organic mental disorders and affective disorders. TR 606. The form stated that Plaintiff demonstrated "[p]sychological or behavior abnormalities associated with a dysfunction

---

[16]The name of the individual who completed this form is illegible.

of the brain," apparently based upon "cog. d/o NOS." TR 608. The form also noted "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," as evidenced by "Dep D/O NOS" and "Anxiety." TR 609. The form further indicated that Plaintiff demonstrated "[m]oderate" restriction of activities of daily living and difficulties in maintaining social functioning. TR 613. The form further noted that Plaintiff "[o]ften" had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. *Id.* Finally, the form noted that Plaintiff "once or twice" experienced episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from a situation or to experience exacerbation of signs or symptoms. *Id.*

A Mental Residual Functional Capacity Assessment of Plaintiff was completed on March 25, 1999.[17] TR 615-617. This form reported that Plaintiff was "[m]oderately [l]imited" in her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; and her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. TR 615. Plaintiff was also found to be "[m]oderately [l]imited" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with the general public; her ability to accept instructions and respond appropriately to criticism from supervisors; and her ability to respond appropriately to changes in the work setting. TR 616. No other significant limitations were noted. TR 615-616.

---

[17]The name of the individual who completed this form is illegible. TR 615.

Melissa A. Haber, M.A., examined Plaintiff on May 4, 2000.  TR 443.  Plaintiff did not report hallucination, homicidal ideation, or suicidal ideation.  TR 444.  Plaintiff reported depressive symptoms, but stated that they were limited to difficulty concentrating and thinking. *Id.*  Ms. Haber did not observe any depressive symptoms.  *Id.*  Ms. Haber opined that Plaintiff's attention and concentration skills were "impaired," and that Plaintiff's intellectual functioning was in the "low average" range.  *Id.*  Ms. Haber administered the WRAT-III to Plaintiff.  TR 445.  Plaintiff's results indicated that she read on a high school level and that her arithmetic skills were at the sixth grade level.  *Id.*  Ms. Haber did not make any Axis I or Axis II diagnoses. *Id.*

On May 16, 2000, Dr. Tom Neilson, a licensed psychologist, completed a Psychiatric Review Technique form.  TR 447.  Dr. Neilson's medical disposition was that Plaintiff had "[n]o [m]edically [d]eterminable [i]mpairment."  *Id.*  He noted that there were no signs or symptoms of organic mental disorders; schizophrenic, paranoid, or other psychotic disorders; affective disorders; mental retardation; autism; anxiety related disorders; somatoform disorders; or personality disorders.  TR 449-452.  Dr. Neilson noted no substance addiction disorders.  TR 453.

On August 11, 2000, Richard Santina, M.Div., of the Volunteer Behavioral Health Care System, conducted a 50-minute session with Plaintiff.  TR 556.  Plaintiff reported a history of auditory or visual hallucinations.  TR 557.  Mr. Santana noted that these hallucinations appeared to be hystrionic and not schizophrenic.  He noted that Plaintiff's behavior was "guarded," her recent memory was "poor," her concentration was "fair," her insight and judgement were "impaired," her mood was "restricted," her thought flow was "organized," and her thought content was "within normal limits."  TR 558.  Mr. Santana assessed Plaintiff's Global

24

Assessment of Functioning ("GAF") at 70. TR 557.

On August 28, 2000, Plaintiff returned to Dr. Hill and reported having trouble with her memory. TR 531. Plaintiff told Dr. Hill that she could not remember time, appointments, or people's names. *Id.* Dr. Hill reduced Plaintiff's Prozac dosage. *Id.*

Dr. William Regan completed a Psychiatric Review Technique form on August 31, 2000. TR 502-510. Dr. Regan listed his medical disposition of Plaintiff as "Impairment(s) Not Severe," and noted that this disposition was based on the category of "mental retardation and autism." TR 502. Dr. Regan noted that Plaintiff had "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits in the developmental period."[18] TR 503. Dr. Regan opined that Plaintiff had a "[s]light" restriction of her activities of daily living; "[s]light" difficulty in maintaining social functioning; and that she "[s]eldom" had deficiencies of concentration, persistence of pace resulting in a failure to complete tasks in a timely manner. TR 509.

On October 31, 2000,[19] Mary Rutherford, R.N.,[20] examined Plaintiff at the Volunteer Behavioral Health Care System.[21] TR 554. Ms. Rutherford's diagnoses were Axis I "[m]ajor

---

[18]Dr. Regan elaborated on this statement in a handwritten comment, but it is illegible.

[19]The report from this examination is dated October 31, 1900, which is obviously a typographical error. TR 554.

[20]On other medical records, Ms. Rutherford's credentials are listed as "N.P." (presumably referring to "Nurse Practitioner"). TR 553.

[21]Plaintiff attended other sessions with Ms. Rutherford, but the notes from these sessions are illegible. TR 550-553.

25

[d]epression w/o psy. features"; Axis III "obesity, cardiac disease, HTN, diabetes, asthma, sleep apnea, hernias"; Axis IV "poor family support, family conflicts, financial problems"; and an Axis V score of 38.[22]  TR 555.  Ms. Rutherford increased Plaintiff's dosage of Prozac.  *Id.*

### B.  Plaintiff's Testimony

Plaintiff was born on December 14, 1946, and has a high school education.  TR 40. Plaintiff also completed three semesters of junior college.  *Id.*  Plaintiff explained that she quit high school during her second year and subsequently earned her G.E.D.  TR 41.  Plaintiff reported that she had no trouble reading or writing, and that she could add, subtract, multiply, and divide.  *Id.*

Plaintiff stated that, in the past 15 years, she had held jobs in factories and nursing homes.  TR 41.  Plaintiff elaborated that she had worked in garment factories, plastic factories, shoe factories, fuse factories, and carpet factories.  *Id.*  She testified that she had been working since she was 16 years old.  *Id.*  Plaintiff testified that she had worked in nursing homes, and that her responsibilities included lifting residents, changing their beds, and feeding them.  *Id.* Plaintiff reported that, at the time of the hearing, she had a certificate as a nursing assistant in the State of Illinois.  TR 41-42.  Plaintiff testified that she had lived in Tennessee since December 1993.  TR 42.

Plaintiff testified that the last job that she held was at a shirt factory in Nashville, but that the quality of her work was not good and she had trouble staying awake at work.  TR 42.  She reported that she got laid off in 1996.  *Id.*  Plaintiff also reported working as a telemarketer at the Alexander Funeral Home.  TR 43.  Plaintiff reported that she would fall asleep at work, that her

---

[22]Ms. Rutherford "deferred" her Axis II diagnosis.

blood sugar was high, and that she had trouble balancing and walking.  *Id.*  Plaintiff stated that

her co-workers were aware of her medical conditions, but that she was not fired.  *Id.*  Plaintiff

explained that when someone saw her asleep on the job, he would "go hit on the wall or

something and wake me up."  *Id.*  Plaintiff testified that her telemarketing job was the last job

she held before she worked at the shirt factory, and that she had worked there for about six

months sometime in 1995 or 1996.  TR 43-44.

Plaintiff testified that her height was either 5' 3" or 5' 2", and that she weighed about 200

pounds.  TR 44.  Plaintiff stated that she did not think that she had lost any weight recently.  *Id.*

Plaintiff reported that she was an insulin-dependent diabetic, and that she often

experienced swelling in her feet and legs.  TR 44.  Plaintiff stated that she took fluid pills twice a

day to ease the swelling.  TR 44-45.  Plaintiff further stated that the swelling had not gone down

at all for approximately two months.  TR 45.  Plaintiff showed the ALJ her legs and explained

that she could not wear shoes because her feet were too swollen.  *Id.*

Plaintiff reported that "the other night" she had accidentally scratched her leg with her

fingernail and that clear, sticky fluid started coming out of it.  TR 45.  Plaintiff stated that she

was afraid that her leg was going to "bust open."  *Id.*  Plaintiff stated that there did not seem to

be anything specific that brought on the swelling in her legs.  *Id.*  She thought, however, that the

swelling could be related to problems with her kidneys.  *Id.*  Plaintiff explained that she used to

urinate much more often than she did at the time of the hearing, and that the fluid pills had also

become less effective.  *Id.*  Plaintiff also reported problems with her back, and noted that she

could no longer cook because of her back problems.  *Id.*  Plaintiff stated that her daughter had

taken over the cooking responsibilities for their household.  TR 46.

With regard to her pain, Plaintiff testified that her back typically started hurting if she

27

was on her feet for more than five minutes.  TR 46.  She added that the pain started in her back and then went down her legs "around the front," and that the pain would worsen until she sat down.  *Id.*

Plaintiff added that she experienced shortness of breath "all the time" and that she slept with oxygen at night.  TR 46.  Plaintiff reported that she took three breathing treatments each day on a nebulizer machine.  *Id.*  Plaintiff stated that she had trouble controlling the swelling in her legs because when she tried to elevate her legs, she could not breathe.  *Id.*  Plaintiff added that she had to lie on three or four pillows when lying down, and that she had to prop herself up so that she could breathe.  *Id.*  Plaintiff also reported experiencing asthma attacks in which her throat "closes up completely," and reported trouble inhaling and exhaling.  *Id.*  Plaintiff testified that she had inhalers to help her with her asthma, but that her asthma "comes on so sudden."  TR 46-47.  Plaintiff further testified that her asthma attacks scared her children, and that she had an attack one week before the hearing.  TR 47.  Plaintiff stated that she did not know what brought on her asthma attacks.  *Id.*

Plaintiff testified that Dr. Guillermin had told her that she was not to drive a car, work around machinery, or get close to open bodies of water.[23]  TR 47.  Plaintiff reported that she fell asleep on her couch and on the toilet.  *Id.*  Plaintiff stated that when she fell asleep at "inappropriate" times, her children would play tricks on her such as sticking wet toilet paper to her face and drawing on her.  *Id.*  Plaintiff stated that when she fell asleep, she was probably "close to a coma or something."  *Id.*  Plaintiff added that she fell asleep for about four hours in the middle of her daughter-in-law's Christmas party.  TR 47-48.

---

[23]The hearing transcript incorrectly refers to Dr. Guillermin as Dr. Gilmar.  TR 47.

28

Plaintiff testified that at night, she typically could sleep for an hour before waking up, but that sometimes she could only sleep for 20 minutes. TR 48. She reported that her sleep patterns were "all messed up," and that sometimes she took off her oxygen or walked in her sleep. *Id.* Plaintiff stated that sometimes she would get up while sleeping, get a cup of coffee, and then drop it. *Id.*

Plaintiff testified that she was prescribed a "C-PAT" machine in 1996, but that she could not tolerate the machine. TR 48. She added that the machine would not work until she stopped breathing, and then it would blow air up her nose, and that this process woke her up. TR 48-49. Plaintiff reported that the machine made her nose dry, and that she could not tolerate the machine. TR 49. Plaintiff explained that, for this reason, she started sleeping with oxygen, but that sometimes she took the oxygen off in her sleep without knowing it. *Id.* Plaintiff testified that she had been sleeping with oxygen since her last sleep study, which she said had taken place around four or five years previously. *Id.*

Plaintiff further testified that she had osteoporosis, especially in her knees, and that she could not climb stairs or bend. TR 49. Plaintiff reported that if she squatted, she could not get back up without help, and that she had trouble balancing. *Id.* Plaintiff reported that she could not stand in the middle of a room for very long without holding on to anything. *Id.* She recalled that she was in the Post Office once and struggled to stand. TR 49-50. Plaintiff added that when she went to Wal-Mart, she had to get an electric wheelchair because she could not "walk very far." TR 50. Plaintiff testified that when she got out of her car at a store, the first thing she did was get a cart because it worked as a walker for her. *Id.*

Plaintiff testified that she could not walk "very far" without feeling pain in her hips. TR 50. She stated that she did not walk any further than necessary, and that when she went

shopping, her children dropped her off at the front of the store.  *Id.*  Plaintiff said that her

children frequently went grocery shopping for her.  TR 50-51.  Plaintiff also testified that she

occasionally utilized an electric wheelchair from a store when she went out shopping.  TR 51.

Plaintiff testified that she experienced pain if she sat for "too long."  TR 51.  Plaintiff

testified that she felt pain in her legs, and that her doctors told her that she had a degenerated

spine.  *Id.*  Plaintiff reported that she had seen an x-ray of her spine, and that her doctor had said

that part of her spine was "gone," and that it would "never be okay."  *Id.*  Plaintiff further

testified that her doctor said that after he had operated on her, he realized that her spine was in

worse condition than the x-ray had indicated.  *Id.*  Plaintiff further stated that there was

"something in [her doctor's] report about him trying to fix a nerve problem," and that he was not

able to do it.  *Id.*  Plaintiff added that, before her operation, her back hurt 24 hours per day and

she had to take "strong pain pills" in order to sleep.  *Id.*

Plaintiff stated that she still experienced pain in her back if she was "on her feet" too

much.  TR 52.  Plaintiff further stated that her daughter helped her cook and did the dishes.  *Id.*

Plaintiff also said that she could not watch a 30-minute television program without any pain

unless she fell asleep, and that she often fell asleep when she was still.  *Id.*

Plaintiff reported that she had been taking Prozac.  TR 52.  She stated that her doctor

reduced her dosage once, but that her daughter told the doctor that he needed to increase the

dosage again because "she's getting mean and old."  *Id.*  Plaintiff said that she thought that the

Prozac made her less aggravated by things that would "normally aggravate" her.  TR 52-53.

Plaintiff testified that she could not sense a difference when she was taking Prozac, but that other

people could.  TR 53.  Plaintiff testified that she could feel her depression coming on, but that

there was nothing she could do to control it, and she compared it to "sinking" in "quicksand."

30

TR 53. Plaintiff also testified that she experienced anxiety attacks where she felt that "something is really bad going to happen [*sic*]." *Id.* Plaintiff reported that sometimes she felt that if she went to sleep, that she would die. *Id.*

Plaintiff said that she thought she was taking Respidol for her symptoms of depression and anxiety. TR 53. Plaintiff stated that she experienced mood swings, and that she could not think of anything that would make her happy, except for having her health back. *Id.*

Plaintiff also testified that she heard people's voices calling her or asking her to do things when nobody was there. TR 53-54. Plaintiff reported that her hallucinations caused arguments within her family because she thought that her children said things that they did not say. TR 54. Plaintiff stated that she had accepted hearing voices. *Id.*

Plaintiff testified that she was not aware of any side effects of her medications except for dry mouth. TR 54. Plaintiff reported that she had a "a lot of major health problems." *Id.*

With regard to her diabetes, Plaintiff reported that she had been taking her pills like she was supposed to, and that she injected herself with 50 units of insulin three times daily. TR 54. Plaintiff further testified that she had been checking her sugar, but that she could not perform the exercise recommended as treatment for diabetes because of the pain in her back. *Id.* She further reported: "one thing just interferes with something else. It's like a big chain." TR 55.

Plaintiff testified that her blood sugar had been running low, but that she sometimes felt that she was "bogged down and real heavy," and, as a result, felt that she could not move. TR 55. Plaintiff speculated that this feeling might be a result of low blood pressure. *Id.* Plaintiff stated that she took her blood pressure once at her daughter's house and got a reading of approximately 110 over 40. *Id.* Plaintiff reported that she planned to talk to her doctor about her blood pressure and hoped to obtain a blood pressure meter so that she could check her blood

pressure at home.  *Id.*

Plaintiff testified that in addition to not being able to climb steps and squat, she was also limited in her ability to sit for long periods.  TR 55.

Plaintiff testified that she and her 18-year-old daughter, Kim, lived together, and that her two sons visited every weekend in order to "check on me."  TR 56.  Plaintiff reported that her daughter did most of the housework, but that her sons mopped the floors and helped with other chores.  *Id.*  Plaintiff added that she lived in a duplex, and that she did not have stairs in her home because she could not climb stairs.  *Id.*  Plaintiff testified that she held onto a rail in order to get up the one step leading to her front porch.  *Id.*

Plaintiff testified that she had a driver's license, and that she drove "once in a while."  TR 56.  Plaintiff added that sometimes she drove from her house to the grocery store, but that usually one of her children accompanied her.  *Id.*  Plaintiff also testified that she drove to her doctor's appointments, but that she had her children drive her whenever it was possible.  *Id.*

Plaintiff reported that her daughter Kim was home-schooled, but that she did not go to school at the time of the hearing.  TR 57.  Plaintiff testified that her daughter planned to start GED classes.  *Id.*  Plaintiff further testified that her daughter would turn 18 years old the following Saturday.  *Id.*  Plaintiff said that her daughter was home-schooled because she was having trouble in the public school system and also so that she could help Plaintiff around the house.  *Id.*  Plaintiff reported that she helped her daughter "a little bit" with her school work.  *Id.*  Plaintiff further testified that her daughter had been in home-school since 1998.  TR 58.

Plaintiff testified that she did not have a handicap parking permit on her car, but that she wished she did.  TR 58.  Plaintiff further testified that she did not have a handicap permit because she thought that she had to get one through Social Security.  *Id.*  Plaintiff added she

thought that everyone she had talked to about getting a permit had told her that she had to get one through Social Security.  TR 59.

Plaintiff testified that she had studied computers in college, but that this was in 1986 and she had not kept up with her skills since then.  TR 59.  Plaintiff added that she had never used her college education because she had never had any experience, and every employer wanted experience.  *Id.*

Plaintiff further testified that she was a "CNA" when she lived in Illinois, and that she earned her "CNA" certification during the three semesters she spent in college.  TR 59.  Plaintiff testified that she worked as a "CNA" "quite awhile ago."  *Id.*  Plaintiff added that she worked as a "CNA" in a nursing home sometime in the 1980's.  TR 60.  Plaintiff reported that she also worked as a private sitter in people's homes, and that she usually stayed in a home for three days at a time.  TR 60-61.  Plaintiff added that she performed this work in the late 1980's and early 1990's.  TR 61.  Plaintiff reported that she did this job on a regular basis.  *Id.*

With regard to her work as a sitter, Plaintiff reported that she did not have to lift any of her patients.  TR 61.  Plaintiff testified that she could not do that work anymore.  *Id.*  Plaintiff stated that her duties in her job as a sitter were to give her patients medicine and to do his or her housework.  *Id.*  Plaintiff added that, at the time of the hearing, she could not longer do her own housework.  *Id.*

With regard to her work at the garment factory, Plaintiff reported that she had worked as a machine operator.  TR 62.  Plaintiff further reported that she had operated a mechanical robot, water jet cutter, and similar machinery.  *Id.*  Plaintiff stated that she had been healthy at the time that she performed this work.  *Id.*

Plaintiff further testified that she had worked as a sewing machine operator, and that she

33

had sat all day in this job.  TR 62.  Plaintiff added that she sewed women's nightgowns, housecoats, robes, and men's shirts.  *Id.*  Plaintiff stated that, in this job, there was a lot of lint and debris in the air.  TR 62-63.

Plaintiff testified that she had worked as a telemarketer in a funeral home for about six months, and that she worked with others.  TR 63.  Plaintiff added that each employee had his or her own "little office."  *Id.*  Plaintiff stated that she sat the whole day, but that she could get up or sit down at her leisure.  *Id.*  Plaintiff reported that in this job, she sold funeral plots.  *Id.*  Plaintiff testified that this job was stressful because people often hung up on her or cursed her out.  TR 63-64.  Plaintiff reported that she "would feel like I was doing something bad to people" when doing this job because people hated telemarketers, and there was so much negative publicity about telemarketing.  TR 64.  Plaintiff added that in this job, she made $6 per hour plus commissions, and that she could not remember how much she made in commissions.  TR 64-65.  Plaintiff reported that she had problems in her telemarketing job because she fell asleep on the job.  TR 65.

Plaintiff testified that she only used the "C-PAP" machine for sleep apnea at the sleep study.  TR 65.  Plaintiff further added that a "C-PAP" machine was brought to her house and that she tried it, but that she could not tolerate the machine.  *Id.*  Plaintiff stated that she did not like the machine because it dried out the inside of her nose.  *Id.*  Plaintiff added that she had problems breathing even without the machine because she had "COPD."  *Id.*  Plaintiff testified that the machine felt "like a fan" going up her nose.  TR 66.  Plaintiff further testified that she was not given a choice of machines, and that because she could not tolerate the "C-PAP" machine, she was given oxygen.  *Id.*  Plaintiff stated that she was unsure how the oxygen helped her condition.  *Id.*  Plaintiff reported that she received oxygen through a tube that went in her

34

nose, but that this treatment method was less forceful than the "C-PAP" machine. TR 66-67.

Plaintiff testified that she never tried the "C-PAP" machine for an extended period of time, but that she could not tolerate the machine for even a short period of time. TR 67. Plaintiff reported that the purpose of the machine was to provide her with oxygen if she stopped breathing while she was asleep, but that she could not sleep when she was connected to the machine. *Id.* Plaintiff explained that the "C-PAP" machine expelled air more forcefully than the oxygen machine. *Id.* Plaintiff and the ALJ then engaged in a dialogue where the ALJ reported having used a "C-PAP" machine himself, but stated that he no longer used it because "I lost weight and that was the end of my problem." *Id.* The ALJ then mentioned that the "C-PAP" machine took getting used to, and that "you've got to give it a chance." *Id.* Plaintiff further reported that she was not offered an operation in the alternative, and that her doctor told her that he would not operate on her because of her weight. TR 68. Plaintiff added that her doctor advised her to lose weight, and that she tried to do so. *Id.*

The ALJ noted that Plaintiff had a 20-ounce cup of coffee with her at the hearing, and he asked her about her coffee drinking habits. TR 68. Plaintiff stated that her doctor did not give her any instructions regarding coffee, except that he told her to drink decaffeinated coffee. *Id.* Plaintiff testified that the coffee that she was drinking at the hearing was decaffeinated. *Id.* Plaintiff further testified that she drank decaffeinated coffee "most of the time," but that sometimes she would forget to ask for decaffeinated coffee. *Id.* Plaintiff reported that she had been drinking decaffeinated coffee ever since she found out that she had an enlarged liver. *Id.* Plaintiff reported that a liver specialist had told her that caffeine could cause liver problems. TR 69. Plaintiff stated that she could not recall what year the liver specialist told her this. *Id.* Plaintiff explained that she drank decaffeinated coffee "99 percent of the time" because she said

35

the doctor told her that her liver problem could turn into cirrhosis of the liver.  *Id.*  Plaintiff also

reported that her doctor told her not to drink, and that she did not drink except on special

occasions like New Year's Eve.  TR 68-69.

 Plaintiff added that she did not sleep regularly, and that she drank diet soft drinks.  TR

70.  Plaintiff stated that the soft drinks she consumed were decaffeinated soft drinks, such as Dr.

Pepper, Sprite, and 7-Up.  *Id.*  Plaintiff added that the bottles stated that the drinks did not have

caffeine in them.  *Id.*  Plaintiff reported that she drank one or two soft drinks per day.  *Id.*

Plaintiff testified that she could not lift "very much" around the house.  TR 70.  She

stated that she could lift a gallon of milk from the refrigerator to the counter, but that she did not

lift baskets of clothing or similar items.  *Id.*  Plaintiff recalled that, at one point, a doctor did an

assessment of her abilities and told her how much she could lift, but that she did not remember

what the assessment said.  TR 71.  Plaintiff said that she thought that the doctor told her not to

lift more than five pounds.  *Id.*

Plaintiff testified that she was seeing Dr. Hill at the time of the hearing.  TR 71.  Plaintiff

added that Dr. Hill did not conduct a functional capacity evaluation, but that he did conduct an

evaluation for disability.  *Id.*  Plaintiff added that she did not lift very much because she did not

want to do anything to make her back worse than it already was.  TR 71-72.

Plaintiff testified that she helped her daughter do the cooking at home.  TR 72.  Plaintiff

explained that she only performed tasks such as putting a piece of meat in a crockpot because

cooking an entire meal would take Plaintiff "all day."  *Id.*  Plaintiff added that sometimes she

would wash dishes, but that she normally did not wash dishes for more than five minutes at a

time.  *Id.*  Plaintiff explained that when she did any household chores, she worked only for a

short period of time before sitting down because her back would start to hurt.  *Id.*  Plaintiff stated

36

that washing dishes was one of the easier chores for her to perform because it did not require much bending and lifting.  *Id.*

Plaintiff testified that her sons normally mopped the floors, and that her daughter "[ran] the sweeper," dusted, and cooked.  TR 72.  Plaintiff added that she performed small tasks, such as peeling three potatoes for dinner.  *Id.*

Plaintiff said that she did not go to church or participate in social activities, but that she wished she could, and added that she needed to do so.  TR 73.  Plaintiff added that she watched television, and that she especially liked to watch the news.  *Id.*  Plaintiff also added that she liked to play bingo, but that she could not play often.  *Id.*  Plaintiff stated that she did sit on her porch and talk to her neighbors.  *Id.*  Plaintiff explained that her housing complex took care of the yard work.  *Id.*

Plaintiff stated that she could not raise her right leg.  TR 73.  For this reason, she said, she had trouble dressing that leg, but could otherwise dress herself.  TR 73-74.  Plaintiff reported that if she put on pants, she had to put them on the floor and step into them.  TR 74.

Plaintiff added that changes in the weather aggravated the arthritis in her knee.  TR 74.  Plaintiff testified that her knees "always hurt" and that they were "always stiff," but that the changes in weather made the pain worse.  *Id.*

Plaintiff stated that she smoked, but that she had reduced her smoking.  TR 74.  Plaintiff explained that she had cut down to smoking one pack per day.  TR 74-75.  Plaintiff speculated that she had drank no more than one 12-pack of beer in her entire life.  TR 75.  Plaintiff added that she was not a steady or social drinker.  *Id.*  Plaintiff testified that before the doctor told her about her liver problems, she drank about six or seven cups of regular coffee each day.  *Id.*

Plaintiff testified that she thought that she had been on insulin since 1994.  TR 76.

37

Plaintiff stated that she thought that she was "worse" at the time of the hearing than she had been in 1994. *Id.* She stated that "most everything" about her was worse. *Id.* Plaintiff noted that the amount of work that she could do had decreased greatly. *Id.* Plaintiff testified that she could no longer get the mail, and that it took her an entire day to cook a meal. *Id.* Plaintiff stated that there were things that she could do the year prior to the hearing that she could no longer do at the time of the hearing, such as cooking a full meal and assembling things. TR 76-77. Plaintiff added that her knees hurt more than than they did a year before the hearing, and that she felt that her health in general had worsened. TR 77. Plaintiff added that her doctor had told her that he thought she had "maybe five years" left to live. *Id.* Plaintiff reported that her doctor asked her if there was anything he could do that he had not done to improve her health, and that he asked her this because he could not see her living to the age of 60 at the rate her health was progressing. *Id.* Plaintiff added that the doctor had told her that she would be on dialysis for part of the five years that she had left to live. TR 78. Plaintiff said that the doctor told her "you're going to be going home feeling like, you know, everything's okay," and then he added "the whole bottom's going to drop out of everything." *Id.*

Plaintiff testified that she had received mental health care from Dr. Mary Releford.[24] TR 78. Plaintiff stated that she had been seeing Dr. Releford for "about a year." *Id.*

Plaintiff's attorney asked Plaintiff if she thought that her petition was correct when it asserted her disability onset date as November 30, 1996. TR 78. Plaintiff replied that this was an accurate date, as far as she could remember. TR 79. Plaintiff added that she had worked as long as she could work. *Id.* Plaintiff added that she did not have any income, and that she had

---

[24]No records from a "Dr. Releford" are in the record. It is possible that the hearing transcript mistakenly referred to Ms. Rutherford as Dr. Releford.

been living on $142 per month and food stamps.  *Id.*  Plaintiff testified that her money came from

the State, and that her sons helped her financially when they could.  TR 80.  Plaintiff added that

she lived in public housing, and that she used to receive "AFDC" for her daughter, but that she

lost that funding when her daughter turned 18.[25]  *Id.*  Plaintiff added that her daughter used to

work at McDonald's, but that she quit after about six months in that job.  *Id.*

### C.  Testimony of Plaintiff's Daughter, Kim Cook

Plaintiff's daughter, Kim Cook, also appeared and testified at Plaintiff's hearing.  TR 35.

Ms. Cook testified that she lived with Plaintiff and that she had lived with Plaintiff since

November 1996.  TR 81.  Ms. Cook further testified that she had been home schooled for two

and a half to three years.  *Id.*  Ms. Cook stated that her mother helped her with homework and

lessons.  *Id.*

Ms. Cook stated that since December 1999, Plaintiff could cook "an egg or something

simple that doesn't take very long," but that standing up aggravated Plaintiff's back and the

swelling in her feet.  TR 81.

Ms. Cook testified that she was the youngest of six children born to Plaintiff.  TR 81.

Ms. Cook added that the chores that she did for Plaintiff included laundry and house cleaning.

*Id.*  Ms. Cook added that she sometimes helped Plaintiff wash her hair and other similar

activities.  *Id.*  Ms. Cook also stated that she and Plaintiff went grocery shopping together, and

that Plaintiff either pushed a shopping cart or rode on "one of them scooters" in order to keep her

balance.  TR 82.

---

[25]The age of Plaintiff's daughter at the time of the hearing is unclear.  Plaintiff had
testified earlier in the hearing that her daughter had not yet turned 18, but was about to do so.
TR 56.  Plaintiff's daughter seemingly testified that she was already 18.  TR 87.

With regard to Plaintiff's sleep apnea, Ms. Cook testified that Plaintiff had fallen asleep in the middle of conversations and while driving. TR 82. Ms. Cook added that Plaintiff "almost had a wreck" once because she fell asleep while driving, and that Plaintiff could not drive unaccompanied. *Id.* Ms. Cook reported that she played tricks on Plaintiff when she fell asleep such as wrapping her in toilet paper. *Id.* Ms. Cook added that Plaintiff could not sit and watch a 30-minute television program without falling asleep. *Id.*

With regard to Plaintiff's physical abilities, Ms. Cook testified that the heaviest thing she had seen Plaintiff lift was a bag of groceries, and that she had probably seen Plaintiff lift a "a couple ounces" at most. TR 82. Ms. Cook added that Plaintiff's legs were swollen, and that white fluid had recently come out of Plaintiff's leg when she scratched it. *Id.* Ms. Cook added that Plaintiff "can't barely move her ankles, and it hurts when she stands on her legs too." TR 82-83. Ms. Cook also reported that Plaintiff had problems getting up. TR 83.

Ms. Cook testified that Plaintiff was unable to "get out and associate with people," and that she rarely walked "from house to house." TR 83. Ms. Cook further testified that Plaintiff took Prozac, and that Plaintiff's behavior was different when she took the medication. *Id.* Ms. Cook explained that the medicine helped Plaintiff and that when she did not take it, she got very depressed. *Id.* Ms. Cook added that even with the Prozac, Plaintiff experienced mood swings. *Id.* Ms. Cook added that, at the time of the hearing, Plaintiff was experiencing a "pretty good" period for her. *Id.*

Ms. Cook testified that Plaintiff also had breathing problems. TR 83. Ms. Cook explained that when Plaintiff stood up for long periods of time, had a dry throat, or got hot, she would have an asthma attack. *Id.* Ms. Cook added that Plaintiff had coughing spells "all the time." TR 84.

40

Ms. Cook testified that the frequency of Plaintiff's sleeping during the day was variable, but that she normally stayed asleep for an hour at a time. TR 84. Ms. Cook added that Plaintiff did not sleep well at night because she got up nearly every hour. *Id.* Ms. Cook reported that the longest Plaintiff slept at a time was about two or three hours. *Id.*

Ms. Cook testified that she was in the eighth grade when she started home-schooling, but that her home school promoted her to tenth grade. TR 84. Ms. Cook testified that she used to work part-time at McDonald's. *Id.* Ms. Cook stated that she had gone into the home school program because she wanted to catch up in school and because Plaintiff needed her help around the house. *Id.* Ms. Cook explained that she, herself, had no health reasons which caused her to enter home school. TR 85.

Ms. Cook testified that she did not have a driver's license, and that she often rode with Plaintiff when she drove. TR 85. Ms. Cook also testified that the family traveled to Patoka, Illinois on holidays, and added that she had been to Illinois one time in the past year. TR 85-86. Ms. Cook testified that the family did not visit relatives in Alabama or Georgia, and that the family travel was limited to visiting Patoka. TR 87.

Ms. Cook testified that Plaintiff played bingo about once every three months, but added that Plaintiff had not been driving much recently. TR 86. Ms. Cook added that when her sister came to visit, she would take Plaintiff to play bingo with her. TR 87.

Ms. Cook testified that Plaintiff's condition was "about the same" as it was a year prior to the hearing. TR 87. Ms. Cook stated that Plaintiff "really started going downhill" with her sleep apnea when Ms. Cook was still in school, and that all of Plaintiff's ailments had gotten worse. *Id.* Ms. Cook repeated that she left school when she was in eighth grade, which was approximately three years prior to the hearing. TR 87-88. Ms. Cook again repeated that she

41

essentially went to home-school because of her mother's health, but that she also felt that she could do better academically in a home-school environment.  TR 88.

With regard to her home-schooling, Ms. Cook testified that her home-schooling program sent her books and that she filled them out, and then her mother graded the books and returned them to the school.  TR 88.

### D.  Testimony of Plaintiff's Son, Steven Cook

Plaintiff's son, Steven Cook, also appeared and testified at Plaintiff's hearing.  TR 35.

Mr. Cook testified that he mostly saw Plaintiff on weekends.  TR 89.  Mr. Cook added that he could not recall when he stopped living with Plaintiff full-time, but that it was when he got a job that required him to travel.  *Id.*  Mr. Cook also noted that there was a period when he lived in Jackson, Tennessee.  *Id.*  Mr. Cook testified that it had been about five or six months since he moved out.  *Id.*

Mr. Cook testified that when he had lived with Plaintiff, he and his sister had done the housework, and that his brother Michael and his girlfriend would also help.  TR 89.  Mr. Cook testified that Plaintiff could do "a little bit" of housework, but that she then had to sit down, lie down, and/or rest.  *Id.*  Mr. Cook confirmed that he and his siblings played pranks on Plaintiff when she fell asleep.  *Id.*

Mr. Cook testified that he was 21 years old, and that he worked for Jaret Builders Construction Company.  TR 89.  Mr. Cook added that he came home most weekends, but that his company had started requiring him to work on weekends.  TR 90.

The ALJ asked Mr. Cook if he noticed any difference in Plaintiff's condition since the time that he had lived with her.  TR 90.  Mr. Cook reported that the floor did not look as clean.  *Id.*  He added that Plaintiff did not fall asleep as often then as she did at the time of the hearing.

42

*Id.*

Mr. Cook stated that Plaintiff did not come to visit him in Jackson. TR 90. Mr. Cook reported that he put his things in storage and he went traveling with his company. *Id.* Mr. Cook added that he stayed with his mother or his sisters on weekends. *Id.*

### E. Testimony of Plaintiff's Son, Michael Cook

Plaintiff's son, Michael Cook, also appeared and testified at Plaintiff's hearing. TR 35.

Mr. Cook testified that he lived with Plaintiff until approximately two months prior to the hearing. TR 91.

Mr. Cook reported that Plaintiff could not stand as long as she used to, and that "everyday housework" had become "impossible" for her. TR 91. Mr. Cook added that, in 1999, when he lived with Plaintiff, she had to wear the "fuzzy shoes" that she was wearing at the hearing. *Id.* Mr. Cook explained that Plaintiff wore these shoes because of the swelling in her legs. *Id.*

Mr. Cook stated that Plaintiff fell asleep during the day, and that once Plaintiff fell asleep while driving. TR 92. Mr. Cook testified that he was a passenger in the car at the time, and that he had to grab the wheel when Plaintiff fell asleep. *Id.*

Mr. Cook testified that Plaintiff had worked at the Alexander Funeral Home in 1999. TR 92. Mr. Cook stated that in his opinion, Plaintiff was no longer capable of working. *Id.*

Mr. Cook testified that Plaintiff could no longer stand and that she "always" complained about the pain in her back. TR 92. Mr. Cook added that Plaintiff had "no energy at all." *Id.* Mr. Cook stated that Plaintiff did more housework in 1999 than at the time of the hearing, and that, at the time of the hearing, no housework was done unless one of the children did it. *Id.* Mr. Cook also testified that, although Plaintiff's legs had been swollen in 1999, she could "walk a

43

little bit better" then than she could at the time of the hearing.  TR 93.

Mr. Cook testified that he was 24 years old, and that he and his brother traveled together. TR 93.  Mr. Cook explained that he was in the construction business, and that he was only home on the weekends.  *Id.*

### F.  Vocational Testimony

Vocational expert ("VE"), Kenneth Anchor, also testified at Plaintiff's hearing.  TR 93.

Before the ALJ began questioning the VE, but after the VE had been sworn in, the VE asked Plaintiff whether she had ever worked as a supervisor, office manager, or administrator. TR 93.  Plaintiff replied that she had not.  TR 94.

The VE testified that Plaintiff's past relevant work as a sewing operator would be classified as light exertion and semi-skilled.  TR 94.  The VE stated that Plaintiff's past work as a "CNA" would be classified as medium exertion and semi-skilled, but that he was not sure whether this job was vocationally relevant.  *Id.*  The VE further stated that Plaintiff's past relevant work as a telemarketer would be classified as sedentary and semi-skilled.  *Id.*  Finally, the VE testified that Plaintiff's past relevant work as a sitter or companion would be classified as light exertion and unskilled.  *Id.*

Before presenting a hypothetical to the VE, the ALJ stated that Plaintiff was 53 years old as of 1999, that she had a high school education with some college, that she read at the high school level, and that she did arithmetic at the sixth grade level.  *Id.*  The ALJ asked the VE to consider these limitations.  *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past.  TR 94-95.  The VE answered that the hypothetical claimant would not be able to

44

perform Plaintiff's past relevant work as a sewing machine operator and nurse's aid, but that the hypothetical claimant could perform Plaintiff's past relevant work as a telemarketer and sitter. TR 95.

The ALJ then modified the hypothetical by adding additional limitations. TR 95. These limitations were: moderate limitations with regard to work strains; moderate limitations with regard to understanding, remembering, and carrying out detailed instructions; moderate limitations maintaining attention and concentration; moderate difficulty in dealing with the general public; and moderate difficulty adapting to changes in the work environment. *Id.* The VE answered that the hypothetical claimant would be able to perform Plaintiff's past work as a telemarketer or sitter. TR 96.[26]

The ALJ asked the VE which of Plaintiff's past relevant work would be available that fell into the "sedentary" category. TR 96. The VE replied that the sedentary category included the telemarketer job, but not the sitter job. *Id.* The VE further explained that Plaintiff could perform the telemarketing work if she had a sit-stand option. *Id.*

The VE opined that in the State of Tennessee, there are at least 27,000 jobs which would be appropriate for the hypothetical claimant. TR 96. In particular, the VE opined that at the light exertional level, there were at least 4,000 storage attendant jobs and at least 9,000 general clerk jobs. *Id.* Additionally, the VE opined that at the sedentary level, there were at least 2,000 cost clerk jobs and at least 14,000 table worker jobs. TR 96-97. The VE added that the table worker job could be found at both the sedentary and light levels. TR 97. The VE stated that of the 14,000 table worker jobs, 8,000 of those were sedentary and 6,000 where light. *Id.* The VE

---

[26]Page 96 was missing from the original record, and has been submitted as an attachment to Docket Entry No. 22.

added that in the national economy, there were at least one million jobs that were appropriate for the hypothetical claimant. *Id.*

The VE further testified that if Plaintiff's testimony were to be found fully credible, he "seriously doubt[ed]" that Plaintiff could work full-time. TR 97. Specifically, the VE said that Plaintiff's "distractability from discomfort" could disrupt Plaintiff's work ability. TR 97. The VE additionally noted that jobs required "consistent attention, alertness, concentration," as well as regular attendance, consistent performance and production, energy, and stamina, and that Plaintiff could struggle in all of these areas. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*,

46

745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

47

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[27] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's

---

[27]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by failing to consider that Plaintiff has an I.Q. of 70; failing to consider Plaintiff's obesity in the proper context; and failing to consider Plaintiff's impairments in combination. Docket Entry No. 14. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or, in the alternative remanded for a new administrative hearing before a different ALJ. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and

49

immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Plaintiff's I.Q.

Plaintiff argues that the ALJ erred by not considering Plaintiff's I.Q. test scores, which revealed that Plaintiff had a verbal I.Q. of 91, a performance I.Q. of 70, and a full-scale I.Q. of 79. Docket Entry No. 14. In particular, Plaintiff argues that the ALJ erred by not considering Plaintiff's performance I.Q., Plaintiff's lowest score. *Id.*

Plaintiff essentially argues that the ALJ erred by not fully crediting the I.Q. test scores recorded by Dr. Lee on March 17, 1999. Docket Entry No. 14. The ALJ, in his decision, discussed the May 4, 2000 findings of Dr. Lee and Ms. Haber, which included evidence that contradicts Plaintiff's I.Q. scores. TR 23. When the record contains conflicting evidence, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. *See, e.g.*, 20 C.F.R. § 416.927(e)(2); 20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 416.927(c)(4).

In the May 4, 2000 report, signed by the two evaluators, Dr. Lee and Ms. Haber, Ms. Haber diagnosed Plaintiff as falling into the "Low Average" range of intellectual functioning. TR 445. Although the record does not indicate that an I.Q. test was performed at this examination, Dr. Lee and Ms. Haber mentioned Dr. Lee's March 17, 1999 I.Q. testing, and noted that "the previous evaluation reported slow response time interfering w/testing." TR 444.

Furthermore, in the May 4, 2000 report, Dr. Lee and Ms. Haber stated "No Diagnosis" under the headings of both Axis I and Axis II. TR 445. This is inconsistent with Dr. Lee's March 17, 1999 Axis II diagnosis of "borderline intellectual functioning." TR 445; 626. Thus,

50

Dr. Lee's diagnoses are inconsistent with each other. TR 444-445; 626.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ properly relied on the May 4, 2000 report filled out by Dr. Lee and Ms. Haber, and the regulations do not mandate that the ALJ fully credit Dr. Lee's earlier findings. *See, e.g.*, 20 C.F.R. § 416.927(e)(2); 20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 416.927(c)(4). Because substantial evidence supports the ALJ's finding that Plaintiff did not have a severe mental impairment, the ALJ's finding was proper.

Plaintiff also essentially argues that the ALJ erred by not classifying Plaintiff's I.Q. as constituting a  "severe impairment" based on Plaintiff's scores on an I.Q. test. Docket Entry No. 14. As stated above, it was within the ALJ's province to credit these findings over conflicting findings elsewhere in the record. Thus, Plaintiff's argument fails.

## 2.  Plaintiff's Obesity

Plaintiff argues that the ALJ erred by failing to consider Plaintiff's obesity in the proper context. Docket Entry No. 14. First, Plaintiff argues that the ALJ erred by not finding Plaintiff's obesity to be a "severe impairment" in light of the consultative examiner's finding that Plaintiff had "Class III Extreme Obesity." Docket Entry No. 14; TR 630. Second, Plaintiff argues that the ALJ erred by commenting during the hearing that his own sleep apnea was resolved by losing weight. *Id.*

On October 25, 1999, the Commissioner deleted a listing for obesity and inserted

51

language in the preambles to the musculoskeletal, respiratory, and cardiovascular listings requiring that the effects of obesity be considered in evaluating those impairments.[28]  64 Fed. Reg. 46,112 (August 24, 1999).

Plaintiff argues that she is disabled because of the diagnosis of "Class III Extreme Obesity" made by Dr. Davis, and that the ALJ erred by not fully crediting Dr. Davis' finding. Docket Entry No. 14.  As has been discussed, however, it was within the ALJ's discretion to credit the findings of other doctors over those of Dr. Davis.

Although several doctors noted that Plaintiff was obese, only Dr. Davis diagnosed Plaintiff with Class III Extreme Obesity.  *See* TR 224; 232; 472; 523; 566; 567; 628-630; 722. Dr. Davis diagnosed Plaintiff with Class III Extreme Obesity on February 15, 1999.  TR 628; 630.

Dr. Davis's diagnosis of Class III Extreme Obesity was made during an examination where Plaintiff weighed 225 pounds.  TR 629.  Based on the other medical records, it appears that 225 pounds is close to the most that Plaintiff has ever weighed.  TR 224; 232; 472; 523; 566; 567; 628-630; 722.  At the hearing, Plaintiff testified that she weighed approximately 200 pounds.  TR 44.  Because Plaintiff's stated weight at the time of the hearing was more in line with her weight at the time of her other examinations than her weight at the time at Dr. Davis' examination, it was reasonable for the ALJ to credit the findings of other doctors over those of Dr. Davis.

---

[28]Although Plaintiff did not specifically allege that the ALJ failed to consider Plaintiff's obesity in light of this regulation, the ALJ's decision clearly indicates that the ALJ considered the effect of Plaintiff's obesity on her other limitations.  The ALJ cited the records of several doctors who discussed Plaintiff's obesity.  In particular, the ALJ cited Dr. Gomez, Dr. Manning, and Dr. Cushman, all of whom noted Plaintiff's obesity and/or its effect on her other impairments and abilities.  *See* TR 21-22; 23; 232; 423; 563.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

Plaintiff also argues that the ALJ erred by commenting during the hearing that his own sleep apnea was resolved by losing weight. Docket Entry No. 14. As support for her argument, Plaintiff cites *Sayers v. Gardner*, 380 F.2d 940, 953 (1967), in which the court held that it was error for an ALJ to take administrative notice that obesity is a remediable impairment or that weight loss would necessarily decrease a claimant's back pain.

In *Sayers*, the ALJ noted in his findings that: "obesity is not a disabling condition under the Act as it, in almost all cases, remediable. It may well be that she would have less pain and discomfort if she would lose some weight." 380 F.2d at 953. It was this statement that was found to be in error.

The ALJ in the case at bar did not err by making his comments regarding his experience with sleep apnea. During the hearing, the ALJ mentioned that he had previously used a "C-PAP" machine, but that he no longer needed to use it after he lost weight. TR 67. Unlike in *Sayers*, the ALJ did not state that Plaintiff's obesity was remediable, nor did he opine that Plaintiff's pain would be reduced by losing weight. *See* TR 67. In fact, reference to this dialogue can be found nowhere in the ALJ's opinion. TR 16-25. The ALJ related a personal story that appears to have had no bearing on either the course of the hearing or the ALJ's decision. Thus, Plaintiff's argument fails.

53

### 3. Plaintiff's Impairments in Combination

Plaintiff contends that the ALJ failed to properly evaluate the combined effect of her impairments. Docket Entry No. 14.

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of her impairments. 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff simply maintains that the ALJ did not properly consider the combined effect of Plaintiff's impairments without citing anything in the ALJ's decision that supports this proposition. Docket Entry No. 14.

The ALJ, after evaluating all of the medical, vocational, and testimonial evidence, determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. TR 24. In making this determination, the ALJ specifically noted, *inter alia*, that Plaintiff's "severe" impairments of sleep apnea, diabetes mellitus, and degenerative disc disease; as well as Plaintiff's "non-severe" impairments of obesity, post-cataract vision difficulty, peripheral vascular disease of the right leg, and hepatomegaly, neither individually, nor in combination, meet or equal in severity any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. TR 23. The rationale in the ALJ's decision specifically addresses the medical evidence, as well as Plaintiff's testimony and subjective claims of pain, clearly indicating that these impairments were considered. TR 20-23. There is no evidence to support Plaintiff's claims that the ALJ failed to consider Plaintiff's impairments in combination. To the contrary, it is clear from the ALJ's articulated rationale that the ALJ considered the record as a whole in evaluating the combined effect of Plaintiff's impairments.

Substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing; the ALJ's decision,

54

therefore, must stand.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:02-cv-00819   Document 25   Filed 08/01/05   Page 55 of 55 PageID #: 56